IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| TIERRA INTELECTUAL BORINQUEN, INC., | § § § | |
| *Plaintiff,* | § § | Case No. 2:13-CV-38-JRG |
| *v.* | § § | |
| ASUS COMPUTER INTERNATIONAL, Inc. and OFFICEMAX, INC., | § § § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant OfficeMax, Inc.'s ("OfficeMax" or "Defendant") Motion to Dismiss Plaintiff's Induced Infringement Claims (Dkt. No. 16), filed May 7, 2013. OfficeMax argues that Plaintiff Tierra Intelectual Borinquen, Inc. ("TIB") does not, in certain respects, state a claim for which relief may be granted and moves to dismiss portions of Plaintiff's claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court finds that the Motion should be and hereby is **GRANTED**.

I. BACKGROUND

This is a suit for patent infringement under 35 U.S.C. § 271. Plaintiff TIB owns three United States patents relating to user-selected login systems and signatures. These patents are numbered 7,350,078 ("the '078 Patent"), and 7,725,725 ("the '725 Patent"), and 8,429,415 ("the '415 Patent"). Each patent claims a method, process, or device for creating, storing, and/or authenticating user created signatures—for instance, the passcodes used to unlock mobile devices. Defendant ASUS Computer International, Inc. ("ASUS") sells, among other products,

the ASUS TF700 Transformer Pad Infinity, a device which allegedly infringes each of the patents-in-suit. OfficeMax also sells the ASUS TF700 to customers.

Plaintiff's Complaint alleges both direct and indirect infringement. TIB alleges indirect infringement on both contributory and induced infringement theories. TIB argues that OfficeMax, with knowledge that the patents-in-suit are infringed by users of the TF700, actively induces infringement by its customers who purchase the TF700. In support of this allegation, TIB alleges simply that "the ASUS TF700 Transformer Pad Infinity User Guide instructs, among others, its customers, users, and licensees to perform certain acts by virtue of their use of the ASUS TF700 Transformer Pad Infinity. Defendants' customers, users, and/or licensees perform those acts when they use the ASUS TF700 Transformer Pad Infinity" (Dkt. No. 24, at 14; *see id.* at 16). Reading this allegation in the light most favorable to the Plaintiff, the Complaint alleges that the TF700 User Guide instructs users to perform acts which infringe the '078, '725, and '415 Patents. No other specific mechanism of inducement has been pled.

No specific relationship between OfficeMax and the TF700 User Guide is alleged. That is to say, OfficeMax is not alleged to have written the User Guide, to provide it specially to customers, to make it available on its website, or to otherwise furnish it to customers through any of its own actions. The TF700 User Guide is included in the box with the device as produced and delivered to OfficeMax by ASUS for retail sale. This is the sole means by which OfficeMax can be inferred to have provided the TF700 User Guide to its customers.

OfficeMax argues that TIB fails to state a claim for induced infringement. First, it argues that the User Guide Plaintiff references in the Complaint does not plausibly instruct users to perform the patented methods and processes or use the infringing features of the device; and

second, that because OfficeMax is not alleged to be responsible in any way for the User Guide, it cannot be liable for any inducement caused by the guide's instructions.

## II. LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Detailed factual allegations are not required, but the facts pled must, when accepted as true, state a claim for relief that is "plausible on its face," i.e., the facts pled must allow the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding a motion under Rule 12(b)(6), the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." In order to state a claim for induced infringement, the plaintiff must plausibly allege (1) that a third party, or the defendant in combination with a third party, has performed acts sufficient to constitute infringement; (2) that the defendant knew of the patent and that the acts in question would infringe; and (3) that the defendant had specific intent to encourage the third party's infringement. *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1306 (Fed. Cir. 2012); *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1304-06 (Fed. Cir. 2006); *MEMC Elec. Materials, Inc. v. Mitsubishi Material Silicon Corp*, 420 F.3d 1369, 1378 (Fed. Cir. 2005).

## III. ANALYSIS

### A. Sufficiency of the User Guide

OfficeMax first argues that the text of the TF700 User Guide could not plausibly support an inference of induced infringement. The patents-in-suit each pertain to user-selected signatures and identification; as such, they require (to take one example from Claim 1 of the '078 Patent) "recording user input signals by type from at least one user-selected device among a plurality of selectable user input devices." Users of the TF700 are alleged to infringe by selecting from a menu of several methods for unlocking the product—for example, a user may choose to unlock the product using face recognition, a password, or by drawing a pattern. But the TF700 User Guide does not instruct readers on how to choose a method for unlocking the device; rather, it instructs users only to "[t]ap and drag the lock out from the circle to the lock icon to unlock your ASUS Transformer Pad" (Dkt. No. 16-1, at 14).[1] The User Guide gives no further instruction in choosing methods for unlocking the TF700. OfficeMax thus argues that the User Guide does not instruct users to perform the steps claimed by the patents-in-suit.

In response, Plaintiff essentially argues, first, that it need not plead as specifically as Defendant suggests, and second, that the User Guide does plausibly instruct users to infringe the patents-in-suit.

Plaintiff is correct that it need not allege that the User Guide instruct users on how to infringe each step of the claimed method with specificity. *See, e.g.*, *In re Bill of Lading Transmission and Processing System Patent Litigation*, 681 F.3d 1323, 1342-43. The Federal

---

[1] Plaintiff argues that the Court may not consider materials outside of the pleadings on a 12(b)(6) motion (Dkt. No. 18, at 4). This is incorrect. In disposing of a motion under Rule 12(b)(6), the Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The User Guide is referenced in the Complaint and, being the sole allegation supporting Plaintiff's claim of induced infringement, is clearly central to Plaintiff's claim.

Circuit has cautioned that "there is no requirement that the facts alleged mimic the precise language used in a claim; what is necessary is that the facts, when considered in their entirety and in context, lead to the common sense conclusion that a patented method is being practiced." *Id.* However, vague allegations that the User Guide instructs infringement are not sufficient by themselves; the Court must be willing to examine the plausibility of the Complaint in light of the relevant documents themselves. *See id.* at 1342 ("In some circumstances, failure to allege facts that plausibly suggest a specific element or elements of a claim have been practiced may be fatal in the context of a motion to dismiss"). If the User Guide teaches an "undisputedly non-infringing use," no inference of intent to induce infringement may be drawn. *See Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317 (Fed. Cir. 2009).

Having examined the documents, the Court finds that Plaintiff has pled sufficient facts to support a plausible claim for relief. Notably, the Court has not yet held a *Markman* hearing to determine how the claims of the patents-in-suit should be interpreted. As such, the Court evaluates Plaintiff's allegations in light of patent language that remains ambiguous and unresolved. Thus, the Court has not yet determined the boundaries of, for example, the "recording" step of Claim 1 of the '078 Patent. It is not prepared, at this early stage of the case, to hold that the claimed methods could not *plausibly* be infringed by users following the instructions in the User Guide, namely, by sliding the TF700's lock icon across the screen to unlock the device. The Court cannot yet say that such a process does not involve "receiving user indication of signature input recording; recording user input signals by type," and so on. ('078 Patent at 10:49-50).

### B. Retailer's Induced Infringement

The next question is whether OfficeMax, a retailer alleged to have no particular involvement in the preparation or distribution of the TF700 User Guide, may be held liable for induced infringement based solely upon its alleged knowledge that the Guide, in combination with the TF700 itself, induces infringement of the patents in suit. The question, in essence, is whether a third party's mens rea of specific intent may be imputed to a defendant with knowledge of that intent, in the absence of further steps by the defendant to induce infringement. For the reasons stated below, the Court finds that such a result would be inconsistent with the induced infringement statute, the case law interpreting it, and the policy rationales of our patent system.

Direct patent infringement is a strict liability cause of action and requires neither knowledge nor specific intent on the part of an infringing defendant. *Akamai*, 692 F.3d at 1307. In order to be liable for direct infringement, though, a single party, either personally or vicariously, must commit all the acts necessary to infringe the patent. *Id.* A person who does *not* infringe each limitation of a claimed patent is thus *not* liable for infringement. This simple rule serves most cases well, but, were it the *only* rule, potential infringers could avoid liability simply by dividing their infringement among multiple parties. From this circumstance evolved the doctrine of indirect infringement, which attaches liability to parties who deliberately enable infringement without committing all of the infringing acts themselves. *See* 35 U.S.C. § 271(b), (c).

Because an indirect infringer does not directly replicate each of the steps or limitations of the patented invention, some further element is required to support liability. Induced infringement effectively substitutes a party's mens rea—his or her "specific intent" that the

patent be infringed—for the specific steps or components of the claimed invention that the party does not personally or vicariously infringe. *Akamai*, 692 F.3d at 1308; *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060, 2065 ("Although the text of § 271(b) makes no mention of intent, we infer that at least some intent is required."). A mens rea of specific intent traditionally requires an "intent to accomplish the precise . . . act that one is later charged with." BLACK'S LAW DICTIONARY (9th ed. 2009).

However, profit-seeking corporations are often indifferent to *how* their products are used *after* they have been sold. For example, if Company X makes a product that customers use to infringe patent Y, then Company X may profit from its customers' desire to infringe, but it does not specifically intend that its customers *actually* use its product for infringement—it only desires that its customers *buy* the product from Company X, regardless of whether they ultimately carry out the infringing acts.

Instead of requiring strict specific intent, then, courts typically allow juries to construct the required intentionality out of evidence that the defendant deliberately exploits the *potential* for the product to be used in infringement. Such evidence ordinarily consists of *knowledge* that the accused product may be and is used to infringe the patent-in-suit *plus* some other factor indicating the defendant's desire to "attract users of a mind to infringe."[2] *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 926 (2005) (discussing copyright infringement but explicitly treating copyright and patent regimes in parallel). For instance, a party may be held liable for induced infringement on the basis of evidence that the defendant advertised the infringing feature of the product or tied its revenue to infringing uses. *Id.* at 931-37.

---

[2] In this case, OfficeMax's knowledge of the alleged inducement is hypothesized, so the Court need not analyze the willful blindness standard recently addressed by the Supreme court in *Global-Tech*. The issue is whether knowledge of inducement is sufficient to find intent to induce infringement, not whether knowledge may be imputed to Defendant on the basis of its deliberate avoidance of information.

7

In order to be sufficient for a finding of specific intent, however, the evidence must prove something *more* than the defendant's knowledge that its products may be used for infringement. *See DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293 (2006). The intent prong of induced infringement requires that "the inducement must involve the taking of affirmative steps to bring about the desired result." *Global-Tech*, 131 S.Ct. at 2065; *accord DSU*, 471 F.3d at 1306. Such affirmative steps establish the defendant's "purposeful, culpable expression and conduct." *Id.* (quoting *Grokster*, 545 U.S. at 937). In the absence of such evidence, a defendant is not liable for induced infringement. It is this requirement for affirmative evidence that separates an intent or purposefulness standard of mens rea from one of mere knowledge.

Though the distinction between simply knowing the consequences of one's voluntary actions and intending them may be conceptually murky, the law clearly sets a purposefulness standard for induced infringement. *See DSU*, 471 F.3d at 1305-06; *cf. Grokster* 545 U.S. at 931-37 (outlining an intent standard for copyright infringement, explicitly drawn from parallel patent law, and distinguishing when knowledge *is* sufficient mens rea—when a device has no "commercially significant noninfringing uses," thus validating an inference of intentional inducement).

The *Grokster* court explains why the distinction between knowledge and purpose has persisted in patent law as in other contexts[3]: a doctrine that "absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of more acute fault than the mere understanding that some of one's products will be misused . . . . leaves breathing room for innovation and a vigorous commerce." 545 U.S. at 932-33.

---

[3] *See, e.g.*, *Invensense v. STMicroelectronics*, Case No. 2:13-cv-405-JRG, Dkt. No. 104, at 4-9 (E.D. Tex., Jan. 10, 2014) (discussing the distinction in the context of personal jurisdiction).

Evidence of intentional infringement, however, "overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use." *Id.* at 933.

A heightened standard of purposeful inducement, then, is beneficial because it establishes a safe harbor in which market participants may trade in even potentially infringing goods so long as they do not cross the line into active encouragement of infringement. This safe harbor serves two purposes: first, it ensures the availability of useful devices that can nonetheless be misused for nefarious purposes. A similar accommodation has been reached in tort law concerning products such as bullets that are useful but predictably dangerous. *See, e.g.*, *McCarthy v. Olin*, 119 F.3d 148 (2d Cir. 1997) (holding that a manufacturer of "cop killer" bullets was not liable under a products liability theory, since its products worked as intended). Holding purveyors of such potentially useful devices liable for indirect infringement would prevent those devices from reaching the market in spite of their potential benefits. By allowing a market participant to sell a product *knowing*, but not actually *intending*, that the product will be used to infringe allows society to reap important benefits.

The second reason a safe harbor is useful is that it promotes fluid and efficient trade in a market economy that often divides the tasks of production and distribution. The typical chain of commerce for an average consumer product today includes at least a manufacturer, a wholesaler, a retailer, and a consumer. Manufacturers specialize in the production of goods; retailers efficiently purchase existing products and market them to customers; wholesalers keep the stream of commerce flowing smoothly by aggregating demand and managing sales to retailers. The availability of low-cost, arms-length transactions in goods among merchants allows the market participants to sort themselves efficiently, ultimately resulting in low prices for the consumer. Knowledge-based liability for patent infringement would add friction to this system

by forcing market participants to assess potential liability before purchasing potentially infringing devices and selling them to the next potential buyer.

Patent law is a specifically market-based discipline: patents "promote the Progress of Science and useful Arts, by securing for limited times to . . . Inventors the exclusive Right to their . . . Discoveries." U.S. CONST. art. I. § 8; *see also Bilski v. Kappos*, 130 S.Ct. 3218, 3252-55 (2010) (discussing the utilitarian values of the patent system). Patents explicitly balance the market incentive of a temporary monopoly against the costs of that monopoly in the hopes of securing more benefits than are paid in market costs. The careful utilitarian balance of this system is undermined if the monopoly granted so restricts the free market that retailers must hire patent lawyers just to sell products. Accordingly, the heightened "specific intent" standard for induced infringement, which protects market participants who merely *know* that their products are used for infringement, is consistent with the broader market-based rationale for the patent system as a whole.

The discussion above reveals two key principles for the Court's analysis of whether OfficeMax can be held liable for induced infringement on the basis of the facts pled: First, it is clear that induced infringement requires specific intent, as distinguished from mere knowledge. Such intent must be proven by evidence of affirmative acts undertaken by the defendant to encourage or otherwise promote infringement. Second, the purpose of this distinction is to protect market participants who *know* that their products infringe but who are more or less indifferent to this fact. This protection ensures the availability of potentially infringing products with substantial noninfringing uses and preserves commercial fluidity by limiting liability to those market participants who take an active role in promoting infringement.

The cases cited above establish unambiguously that OfficeMax would not be liable if it merely knew that the ASUS TF700 were capable of infringing TIB's patents and sold the product anyway. Plaintiff alleges, however, that OfficeMax not only knew of the potential for infringement, but also knew that *another party* to the case was actively inducing infringement by including instructions on infringing TIB's patents in the TF700 User Guide.[4] Knowing this to be the case, OfficeMax nonetheless continued to sell the TF700 tablets in combination with the infringing User Guide. TIB argues, essentially, that OfficeMax's knowing participation in this causal chain between manufacturer and consumer supports a finding that OfficeMax specifically intended to induce infringement. Having considered the question carefully, the Court holds that OfficeMax's pled knowledge of the instructions in the ASUS User Guide is insufficient to support a claim of induced infringement.

First, the language of the statute and the case law interpreting it make clear that "active" inducement consisting of "affirmative steps to bring about the desired result" is a baseline requirement for a defendant's inducement liability. 35 U.S.C. § 271(b); *Global-Tech*, 131 S.Ct. at 2065. ASUS may be liable for induced infringement, since it prepared the TF700 User Guide and packaged it with the TF700 tablet. OfficeMax has taken no affirmative steps to induce infringement. Having learned of ASUS's infringing behavior, it simply continued its business as usual. It did not highlight the instruction in the User Guide to customers or advertise the TF700's infringing features; in fact, literally no change in OfficeMax's behavior is alleged. It is clear to the Court that the failure to change behavior in light of a new fact cannot be characterized as an affirmative step evincing desire on the part of OfficeMax that users infringe TIB's patents.

---

[4] Of course, the Court assumes such infringement only for the purposes of this Motion.

Even if the act of continuing to sell a product after gaining knowledge of induced infringement could be recharacterized as an "affirmative step[] to bring about the desired result" of infringement, however, such verbal acrobatics would defeat the purpose of the law's distinction between knowledge and intent. As discussed above, the law requires evidence of affirmative steps, not because there is a clear difference between knowing the consequences of one's behavior and intending them, but because such an evidentiary hurdle ensures the availability of useful products and protects neutral market participants who are indifferent to the possibility of infringement.

OfficeMax, as portrayed in TIB's Complaint, is the classic neutral reseller. Its business consists of purchasing office products in bulk and reselling them at retail to its customers. No special relationship between OfficeMax and ASUS is alleged. OfficeMax does not advertise the infringing features of the TF700; nor does it instruct users on the infringing functionalities of the device. As portrayed in the Complaint, OfficeMax is purely an engine of pure commerce, arbitraging the price gap between wholesale and retail and efficiently distributing office products to consumers.

This Court should not impose liability on the very resellers for whom the protection of the knowledge/purpose distinction is designed. OfficeMax would then be forced to either stop selling the product completely or to somehow mitigate the alleged inducement—perhaps by negotiating with ASUS to reword its User Guide. Such a result, obviously, would interfere with the natural operations of the market, and would be inconsistent with "the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use." *Grokster*, 545 U.S. at 933.

The other possibility—that, on notice of induced infringement, OfficeMax would simply stop selling the TF700 tablet—is equally invidious. If the TF700 may be used to infringe TIB's patents, but need not be so used—in other words, if the TF700 has "substantial noninfringing use[s]"—then OfficeMax is *entitled* to sell it as a staple article of commerce so long as it does not take affirmative steps to induce infringement.[5] 35 U.S.C. § 271(b), (c). If an unrelated third party's inducement can be imputed to a neutral retailer, then the retailer's ability to sell useful articles is contingent on the behavior of that third party. This is a particularly troubling result if the third party is not the manufacturer, as here, but merely an independent actor delivering instructions on infringing uses. To use a tort illustration, imagine holding a gun merchant liable for gun violence because the merchant knew that *some third parties* advocate the use of guns for violence.

When a device has substantial noninfringing uses, liability for inducement is limited to those actors who advocate infringement with "purposeful, culpable expression and conduct" because *other* actors are presumed to be encouraging only *legitimate* uses. Knowledge of someone else's culpable behavior does not itself imply culpability; a rule attaching liability to a neutral reseller would interfere with the provision of legitimate articles of commerce to the public, and would undermine the utility of the patent system.

The Court thus concludes that the facts as pled do not support an inference that OfficeMax is liable for induced infringement. Though the User Guide may plausibly instruct consumers to infringe on TIB's patents, OfficeMax's sale of the TF700 does not support an

---

[5] Plaintiff has alleged that OfficeMax is also liable for contributory infringement of TIB's patents, and has thus necessarily alleged that the accused features of the TF700 do *not* have substantial noninfringing uses. In analyzing the policy implications of Plaintiff's proposed rule, as opposed to the legal sufficiency of the pleadings, the Court need not assume the facts as pled. In reality, the accused product will often have substantial noninfringing uses even when contributory infringement is alleged, and OfficeMax is used here as an illustration of the impact of Plaintiff's proposed rule on a defendant who is not liable on a contributory infringement basis.

inference of specific intent to induce infringement, even assuming that OfficeMax knew that ASUS deliberately induced infringement in its User Guide. None of the facts as pled allege the affirmative steps to induce infringement that are necessary to survive a motion to dismiss under Rule 12(b)(6).

Of course, additional allegations that OfficeMax took affirmative steps to encourage infringement would support the opposite result. Resellers cannot avoid liability by carefully structuring their transactions so as to externalize inducing behavior; rather, they may avoid liability only by taking no inducing actions at all. *Cf. Global-Tech*, 131 S.Ct. at 2068-71 (holding that "deliberate actions to avoid learning" of a patent will nonetheless trigger liability, but that deliberate indifference to a known risk will not).

Such allegations are not present in Plaintiff's Complaint, and thus dismissal is appropriate.

## IV. CONCLUSION

In accordance with the reasoning above, Defendant OfficeMax's Motion to Dismiss (Dkt. No. 16) is **GRANTED** and Plaintiff's claims with respect to induced infringement are hereby **DISMISSED WITHOUT PREJUDICE**. Furthermore, the Court hereby sua sponte **GRANTS** leave for Plaintiff to file an Amended Complaint within ten days of the date of this Memorandum Opinion and Order.

**So Ordered and Signed on this**

**Mar 3, 2014**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE